IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DOLORES M. ROSE,                         :
as Administratrix for THE ESTATE         :
OF EDWARD M. ROSE II, Deceased,          :
                                         :
            Plaintiff,                   :
                                         :   3:09-CV-01561
v.                                       :   (JUDGE MARIANI)
                                         :
BARRETT TOWNSHIP, LARRY                  :
RAISNER, and ROBERT BURNS,               :
                                         :
            Defendants.                  :

## MEMORANDUM OPINION

### I.   Introduction

Presently before the Court is a Rule 50(b) Motion for Judgment as a Matter of Law

or, in the Alternative, a Rule 59 Motion for a New Trial. (*See* Doc. 166.)  Trial began in the

case of *Rose v. Barrett Township* on July 22, 2013 and ended with a verdict for the Plaintiff

on July 25.  Defendants now seek relief from that verdict.  For the reasons discussed below,

the Court will deny Defendants' Motions.

### II.   Procedural Background

Briefly stated, this case is about the legality of the traffic stop and subsequent arrest

of the late Edward Rose.[1]  Barrett Township police officers Larry Raisner and Robert Burns

stopped Rose's vehicle when the officers allegedly observed a registration lamp dangling

---

[1] This Opinion is primarily written for the benefit of the parties.  As such, the Procedural
Background includes no more information than is necessary to resolve Defendants' Motion.

from the back of his car. During the traffic stop—which is recorded on the patrol car video camera—the officers first approached Rose's car and spoke with him. They returned to the patrol car, at which point Officer Raisner told Officer Burns, "tell him you smell alcohol, cover your behind." The officers then performed a series of field sobriety tests, the results of which the litigants disputed at trial. However, a breathalyzer test indicated Rose's blood alcohol content to be 0.03, well below the legal limit. Rose also admitted to having consumed "five beers," though the timeframe in which he consumed them is unclear. At this point, Burns expressed hesitation about arresting Rose for driving under the influence. Raisner replied, "If you're not gonna [arrest Rose], then I'm gonna," and the officers proceeded to arrest him. During the arrest, however, Rose suffered a heart attack and died shortly thereafter.

Edward's widow, Dolores Rose, initiated this lawsuit on behalf of his Estate. The lawsuit primarily alleges a claim under 42 U.S.C. § 1983 for violation of Rose's Fourth Amendment right to be free from unreasonable searches and seizures.

Following three days of trial, the jury made the following finding:

1. Plaintiff failed to prove that either officer lacked reasonable suspicion for the traffic stop.

2. However, Plaintiff did prove that both officers lacked probable cause to arrest Edward Rose or to detain him following the arrest.

2

3. Plaintiff also proved that Barrett Township (1) followed an official custom of approving of Raisner and/or Burns' conduct, (2) inadequately trained Raisner and/or Burns, and (3) inadequately supervised Raisner and/or Burns; but Plaintiff did not prove that Barrett Township inadequately screened Raisner and/or Burns during the hiring process.

4. Plaintiff proved that such misdeeds caused the deprivation of Rose's constitutional right to be free from unreasonable searches and seizures.

5. Plaintiff proved that the violations of Rose's rights played a substantial part in bringing about his death, and that his suffering and death were either a direct result or a reasonably probable consequence of the Defendants' actions.

(Official Tr., July 25, 2013, Doc. 178, at 5:17-7:10; see also Jury Verdict, Doc. 160, at 1-3.)

After making these findings of fact, the jury assessed only Barrett Township liable, for a total of $100,000 in compensatory damages. Conversely, it held Raisner and Burns liable for no compensatory damages and found that they did not act in such a manner as to subject themselves to punitive damages. (See Doc. 178 at 7:14-19; Doc. 160 at 4-5.)

At various stages of the litigation, Defendants raised a series of motions for judgment as a matter of law.

First, slightly before the close of Plaintiff's case, Defendants submitted a Rule 50(a) Motion for a Directed Verdict. (See Doc. 149.) This Motion argued, generally, that the Court must direct the jury to conclude as a matter of law that Officers Raisner and Burns

3

had reasonable suspicion to stop Edward Rose and that they had probable cause to detain

and arrest him. Alternatively, the Motion argued that, if the Court would not so direct the

jury, the officers were covered by qualified immunity. (Id. at ¶¶ 8, 20.) It also argued that

no evidence existed of Barrett Township engaging in "a policy causing the officers to act

unconstitutionally," so that the Township could not be held liable under Monnell v.

Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). (Id.

at ¶ 23.)

Next, Defendants filed what they called a "50(b) Motion" at the close of all arguments

but before the case was submitted to the jury. (See Doc. 152.) This motion simply

incorporated all the arguments raised in the previous motion and at trial, and sought

"judgment on all remaining claims." (Id. at ¶¶ 1-3.) It is unclear what purpose Defendants

intended this Motion to serve, because, as discussed below, the clear text of Rule 50

specifies that a Rule 50(b) motion is to be made after trial.

Finally, after trial, Defendants did file a proper Rule 50(b) Motion for Judgment as a

Matter of Law. (See Doc. 166.) The Motion requested that the jury's judgment be stricken

and new judgment entered in its favor or, in the alternative, that the Court to "vacate the

judgment and order a new trial." (Id. at ¶¶ 13-14.) In the course of so arguing, this most

recent Motion incorporated the arguments raised in Defendants' previous Motions, (see id.

at ¶¶ 1-2,), and also advanced the following new arguments:

4

1. There was insufficient evidence of *Monell* liability to support the jury verdict. (*Id.* at ¶¶ 3-7.)

2. The Court erred in "denying" Defendants' Second Motion in Limine, which sought to preclude Plaintiff from introducing evidence, based on the National Highway Traffic Safety Administration ("NHTSA") training manual, that DUI field tests cannot be administered to individuals over 65 years of age. (Doc. 166 at ¶ 8.)

3. The Court erred in permitting the introduction at trial of (1) the testimony of non-retained expert witness Attorney Justin McShane and (2) the aforementioned NHTSA manual, because neither were identified until Plaintiff submitted its Pretrial Memorandum. (*Id.* at ¶¶ 9-12.)

As Plaintiff notes in opposition, the Motion does not specify which allegations pertain to which claim for relief. (*See* Pl.'s Brief in Opp. to Defs.' Renewed 50(b) Mot. and Mot. for New Trial, Doc. 173, at 3.) However, the final clause of Defendants' Motion states that "Defendants request that their Motion be granted, judgment entered in their favor, or in the alternative, that the Court order a new trial." (Doc. 166 at 3.) The Court will interpret all of Defendant's requests consistent with this clause, i.e., that Defendants primarily seek judgment notwithstanding the verdict and only seek a new trial if their primary request is denied.

## III.   **Standard of Review**

### a.  **Motion for Judgment as a Matter of Law**

Under Federal Rule of Civil Procedure 50(a),

[I]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

    (A) resolve the issue against the party; and

    (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  Under Rule 50(b),

[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

Fed. R. Civ. P. 50(b).

The Court can only address issues raised in a 50(b) Motion which were first raised in

the 50(a) Motion. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1172 (3d Cir. 1993)

("In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must

timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant

to Rule 50(a), and specify the grounds for that motion.").  "Absent a motion in accordance

with Federal Rule of Civil Procedure 50(a), judicial reexamination of the evidence abridges

[a party's] right to a trial by jury." *Id.* at 1173 (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 183 (3d Cir. 1992)).

However, if the issues raised in a 50(b) Motion have been properly preserved, the Court may grant a motion for judgment as a matter of law if,

> viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.

*Id.* at 1166 (internal citations omitted). In doing so, "the court should review the record as a whole, [but] must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000).

"[J]udgment as a matter of law should be granted sparingly . . . ." *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 F.3d 375, 383 (3d Cir. 2004). Nonetheless, "more than a scintilla of evidence is needed to sustain a verdict. Accordingly, 'we will grant judgment as a matter of law where the record is critically deficient of the minimum quantum of evidence in support of the verdict.'" *Id.* (quoting *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003) (internal alterations omitted).

### b. Motion for a New Trial

In addition to a motion for judgment as a matter of law, a losing party may also move for a new trial pursuant to Federal Rule of Civil Procedure 59. *See* Fed. R. Civ. P. 50(b)

(allowing Rule 50(b) movant to "include an alternative or joint request for a new trial under Rule 59"). "The court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A).

The Court may grant a new trial "purely on a question of law;" or to correct a previous ruling "on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings or prejudicial statements made by counsel;" or "because [the Court] believes the jury's decision is against the weight of the evidence;" among other grounds. *Klein v. Hollings*, 992 F.2d 1285, 1289-1290 (3d Cir. 1993) (internal citations omitted). While the Court has wide discretion to order a new trial to correct rulings that initially rested in its discretion, it has relatively narrow discretion to overturn a verdict on the grounds that the verdict is against the weight of the evidence. *Id.* This is because

> where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960).

> Accordingly, the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. Where the subject matter of the litigation is simple and within a layman's understanding, the district court

8

is given less freedom to scrutinize the jury's verdict than in a case that deals
with complex factual determinations . . . .

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) (internal citations and
quotations omitted).

## IV.    Analysis

### a.  Sufficiency of the Rule 50 Motions

As a preliminary matter, the Court is confronted with the argument, raised in
Plaintiff's Brief in Opposition to the 50(b) Motion, that none of Defendant's Motions are
properly before the Court at all.

As stated above, Defendants first made a Rule 50(a) motion for a directed verdict in
writing slightly before the close of Plaintiff's case, and restated the Motion orally upon the
close of Plaintiff's case. Defendants then filed a second motion which is titled a 50(b)
motion, but which is really a rehash of the first motion, presented "at the close of all
evidence and prior to submission of this case to the jury." (Doc. 152 at 1.)  A second
combined Rules 50(b) and 59 Motion was timely made after the close of trial.

Plaintiff argues that these Motions are not properly before the Court because
Defendants did not file a brief in support of the 50(a) Motion(s) within fourteen days of filing,
as required by the Middle District's Local Rule 7.5. (*See* Doc. 173 at 2.)  If accurate, this
could mean that the Motions could be deemed withdrawn. Rule 7.5 states:

Within fourteen (14) days after the filing of any motion, the party filing the
motion shall file a brief in support of the motion. . . . If a supporting brief is not

filed within the time provided in this rule the motion shall be deemed to be withdrawn.

M.D. Pa. L.R. 7.5. Moreover, if the Rule 50(a) Motion were deemed withdrawn for failure to file a brief, then any 50(b) Motion would also have to be withdrawn, because, as noted on page 6-7, *supra*, a valid 50(a) Motion is a prerequisite to the filing of a 50(b) Motion. By the same token, Plaintiff argues that "if the second Rule 50(b) motion is dismissed . . . the Rule 59 motion should be dismissed with it as it would necessitate repleading the Rule 59 motion after 28 days which the Court has no jurisdiction to grant." (Doc. 173 at 5.) Thus, all of Defendants' post-trial relief would be deemed withdrawn for failure to file a single brief.

As clever as this line of reasoning may be, the Court cannot agree. Rather, the Court finds Plaintiff's interpretation of the Local Rules to be an unduly narrow one, which is not required by the applicable Rules or by the normal practice of trial litigation.

In this regard, the Court must read Local Rule 7.5 consistent with the Federal Rules of Civil Procedure. As stated previously, Federal Rule 50(a) allows a party to file a motion for judgment as a matter of law "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). Rule 50(b) provides that, if the court does not grant the 50(a) motion, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). It further provides that the movant may file a renewed motion for judgment as a matter of law within twenty-eight days after the entry of judgment. *Id.*

The Court does not read Rules 50(a) and 50(b) as requiring two motions which must be briefed separately. Rather, the Court reads them as requiring one motion which may be renewed at a later time as specified by the Federal Rules. Once the Court submits the matter to the jury, the 50(a) motion has effectively been mooted and no further briefing is necessary, unless the movant seeks to renew the Motion in accordance with 50(b). If the movant does so renew it, then the 50(b) Motion—and the 50(b) Motion *only*—must be briefed, as it was here. (*See generally* Defs.' Brief in Supp. of Renewed Rule 50(b) Mot. and Mot. for New Trial, Doc. 172.) This, the Court concludes, is not only the most logical interpretation of the rules, but is also the interpretation most consistent with common trial practice, given that Rule 50(a) Motions, which are commonly asserted orally in the midst of trial, are rarely, if ever, briefed in this district.

The statements which the undersigned made in court are not to the contrary. As Plaintiff notes, I stated, after the jury's verdict had been announced, "I'd note that Defendant has already filed their Rule 50(b) motion, and we'll address that, in accordance with the rules for briefing that are in our local rules."[2] (Doc. 173 at 1 (citing Official Tr., July 25, 2013, Doc. 178, at 8:22-24).) The statement that the Court would address Defendants' Motion "in accordance with the rules for briefing" should not be construed as an independent order to submit a brief where the rules do not so require. Rather, it simply

---

[2] At the time of the Court's remarks, Defendants had filed the motion entitled "50(b) Motion" (Doc. 152). However, this motion is simply a second motion for a directed verdict made during trial, and thus is not really a 50(b) motion, which is a renewed motion for judgment as a matter of law made after trial. Later, Defendants submitted a proper 50(b) motion, entitled "Renewed Rule 50(b) Motion and Motion for New Trial Pursuant to Rule 59(a)" (Doc. 166).

affirms a basic principle of law: that this Court will resolve all matters before it in accordance with the rules. Because the rules do not require an additional brief, none is needed here.[3]

Accordingly, the Court will not deem Defendants' Motions withdrawn, but will proceed to the merits of the arguments raised therein.

### b. Trial Motions (Docs. 149; 152)

#### i. Generally

In the two Motions made during the pendency of trial, which have been incorporated into Defendants' 50(b) Motion, (see Doc. 166 at ¶¶ 1-2), Defendants' make a series of arguments.

The first argument is unclear. In the opening paragraphs of the 50(a) Motion, Defendants make cryptic references to the incorporation doctrine, in which they appear to distinguish between 4th Amendment, 14th Amendment, and Section 1983 claims, and indicate that Plaintiff can only bring its case under one of the three provisions, to the exclusion of the others. (See Doc. 149 at ¶¶ 1-2, 21.) The Court does not understand the attempted distinctions. Nor does it understand the source of Defendants' confusion when Defendants assert a lack of clarity as to whether this case arises under the 4th or 14th

_____

[3] Moreover, even if the Local Rules did support Plaintiff's interpretation, the Rules themselves provide that "[t]he Court may suspend these rules in individual cases by written order." M.D. Pa. L.R. 1.3. The Court would not be fulfilling its obligation, under Federal Rule of Civil Procedure 1, to secure the just determination of every action if it dismissed Defendants' post-trial relief on such a procedural technicality as failure to file a 50(a) supporting brief. Thus, to the extent that Defendants did violate the Local Rules by failing to file a brief, the interests of justice would require that the rules be suspended here.

Amendments. (*See id.* at ¶ 21.) These elementary applications of the incorporation doctrine are well-settled by over a half-century of Supreme Court jurisprudence.

This jurisprudence has established beyond all legal cavil that 4th Amendment claims are cognizable under Section 1983. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 390-392, 91 S. Ct. 1999, 2001-02, 29 L. Ed. 2d 619 (1971). It has just as authoritatively established that the 4th Amendment applies to the states through the 14th Amendment. *See Wolf v. Colorado*, 338 U.S. 25, 27-28, 69 S. Ct. 1359, 1361, 93 L. Ed. 1782 (1949). Thus, contrary to Defendants' attempted distinctions, it is clear that all three provisions—the 4th Amendment, 14th Amendment, and Section 1983—apply to Plaintiff's claim.

Moreover, to the extent that Defendants rely on the rule of *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994), that a 1983 claim cannot be alleged under the substantive Due Process Clause when relief is available under one of the specifically enumerated rights, this argument is likewise unavailing. The Court's opening remarks to the jury make clear that "[t]he Constitutional Right at issue in this case is the Fourth Amendment right against unreasonable seizures," not the Fourteenth Amendment Due Process Clause. (Official Tr., July 22, 2013, Doc. 175, at 7:19-20.) This was repeated in the Court's closing instructions to the jury. (*See, e.g.*, Official Tr., July 24, 2013, Doc. 177, at 164:8-12 ("First [the Estate of Edward Rose] brings a claim for false arrest. Second, it brings a claim for false imprisonment. Both alleged violations of the Fourth Amendment's

protection against unreasonable seizures . . . ."). Defendants did not object to any of these instructions. In fact, the proposed jury instructions and points for charges that Defendants themselves submitted on the record direct the jury that the Fourth Amendment right against unreasonable seizures, not substantive due process, is at issue. (See Proposed Points for Charge, Doc. 129, at 5-10; Proposed Verdict Slip, Doc. 131, at 1-2.) Moreover, in his closing arguments to the jury, Defendants' counsel quoted the Fourth Amendment in its entirety, discussed its applicability to the facts of the case, and instructed the jury on how to apply it. (See Doc. 177, at 145:7-146:11.)

As such, to the extent Defendants base their post-verdict relief on a misapplication of the incorporation doctrine, such basis is unavailing.

Defendants devote the remaining portions of their Trial Motions to arguing, essentially, that (1) Officers Raisner and Burns had reasonable suspicion to stop Edward Rose; (2) the Officers had probable cause to arrest Rose; (3) even if (1) and (2) are false, the Officers are protected by qualified immunity; and (4) there is no basis to find Monell liability against Barrett Township. (See generally Doc. 149; 152.) It is to these arguments that the Court now turns.

### ii. Reasonable Suspicion

There is no longer a question as to the issue of reasonable suspicion, because the jury found that the officers had reasonable suspicion to initiate the traffic stop, (see Doc. 160 at 1), and no one has challenged this determination.

14

### iii. Probable Cause

As to the issue of probable cause, the Third Circuit has "held that the question of probable cause in a section 1983 damage suit is one for the jury." *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978)). "However, a district court may conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter . . . judgment accordingly." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788-89 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

The Court does not believe that the evidence requires a finding that probable cause existed. Indeed, in this Court's previous Opinion of January 18, 2013 denying summary judgment, it stated that "reasonable jurors might differ as to whether they believe that Mr. Rose failed any of the sobriety tests" and that "[a] jury should be permitted to determine whether [the officers' conversation, recounted at page 2, *supra*], captured by the police cruiser's mounted camera, negates a finding of probable cause." (*See* Mem. Op., Doc. 85, at 5-6.)

No new facts have come to light in the intervening time to negate the Court's previous conclusion. The Court therefore still concludes that these areas of reasonable disagreement exist. In viewing the video of the stop and arrest, the jury might have reasonably concluded that Rose passed the sobriety tests, which are unclear on camera.

They could also very reasonably conclude that Rose's breathalyzer reading—a 0.03—is not indicative of intoxication, undercuts the claim that Rose had consumed five beers, and/or casts doubt on the officers' finding of probable cause.

Finally, viewing the officers' private conversations as captured through the objective lens of their patrol car camera, the jury might have reasonably concluded that the officers disregarded evidence of Rose's innocence or acted in bad faith—which, if true, could negate probable cause.

Jurors may have also reasonably found the officers' explanations for their conduct to be unpersuasive. In court, Burns recast his reluctance to arrest Rose as reflective, not of a concern for lack of probable cause, but instead as an attempt to build a case for later prosecution. (See Official Tr., July 23, 2013, Doc. 176, at 96:10-11.) Thus, he stated as reasons for hesitation:

> I want to be completely accurate. I take pride in my work. Just because I have probable cause doesn't mean I stop, I want to build more probable cause and more probable cause and more probable cause. I want an air-tight, solid case, which sometimes means—I'm sorry, I'm trying to answer— which sometimes means more investigation, at that point, I wanted to investigate further.
>
> Though I felt I had enough to make the arrest, that doesn't mean I want to quick do it. I want to make sure that the case was solid as can be. Though I could have made the arrest, I wanted to continue to build evidence. Just because you have some evidence in a case doesn't mean that you disregard some other evidence. You want to get all the evidence in.
>
> If you have a fingerprint, you say, "Oh, I've got a fingerprint, good enough." Well, no. Now, let's get a confession, let's now get the video, you get everything you possibly can. Some may say, "No, we got a fingerprint, it's

good enough." Well, in this particular case, we had probable cause, we could
have made the arrest, however, I wanted to continue to build more and more.
That's all it was.

(Doc. 176 at 96:18-97:13.)

Though the jurors could have accepted this explanation, there was ample evidence
for them to discount it. For one, the in-court statement appears to implicitly contradict the
statements that Burns actually made at the time of the arrest. In the statements captured
on video camera, Burns expressed no desire to collect "more probable cause and more
probable cause and more probable cause." Indeed, he said nothing about continuing to
build evidence at all. Rather, all that Burns said at the time of the arrest was that he did not
want to arrest Rose—from which an obvious inference is that he did not believe there was
enough evidence to do so. The jury could reasonably have concluded that, if all Burns
wanted to do was collect evidence for later prosecution, he could easily have said so at the
time (even assuming that Burns's apparent arrogation of the role of prosecutor was
appropriate or even acceptable from a police officer). Moreover, the jury could very
reasonably have determined that the clear and succinct statements that Burns made at the
scene of the arrest were much more indicative of his then-existing state of mind than were
the oftentimes rambling and confusing statements that he made in trial nearly six years
later.

Similarly, Officer Raisner offered testimony at trial to explain his statements to Officer
Burns to "tell him you smell alcohol" to "cover your rear end." Raisner stated:

17

Officer Burns, at the time, had been on the job, roughly, a year, I believe, with well under 10 DUI arrests. I, on the other hand, had been there for seven years and, approximately, 75 DUI arrests. It is common for me to address someone inside a vehicle to downplay or to make it less confrontational when I ask someone to step out of a vehicle. I commonly say, "just to cover my rear end, I'm going to ask you to step out and do some sobriety tests."

In my opinion, that is a lot softer, per se, than, you know, "Step out of the vehicle." That's basically what I was referring to. Basically, go up, tell the gentleman you smell alcohol, to cover your rear end, you want him to step out.

(Doc. 177 at 30:24-31:10.)

Again, the jury was free to accept this explanation. But it was also free to reject it as self-serving, or as contradicted by the statements captured on video, in which Raisner did not express any concerns about avoiding confrontation. Rather, on video Raisner simply instructed Burns to tell Rose that he smelled alcohol to cover Burns's "rear end." While it is possible that this statement referenced some prior innocuous understanding between the two officers, the jury was not required by law to so conclude. Moreover, because, as discussed below, Police Chief Steven Williams characterized Raisner as one of his "more aggressive officers" and testified to receiving complaints of Raisner bullying or intimidating local citizens, (see pp. 25-28, infra), the jury might reasonably have discounted Raisner's purported concern for avoiding confrontation.

It is impossible to know which facts in particular influenced the jury in finding that no probable cause existed. But suffice it to say, as recited above, there was ample evidence for the jury to have reasonably so concluded.

Nor does the Court believe that the subject matter of this litigation was complex or beyond a layman's understanding, so as to cast doubt on the reliability of the jury's verdict. The important issues in this case revolved around whether the officers lacked probable cause to arrest Rose, as well as whether the officers followed certain Township customs exhibiting deliberate indifference to the rights of people like Rose, or whether the relevant Township decisionmakers inadequately trained or supervised the officers—and, if the answer to each question is "yes," whether such errors caused Rose's injury. In light of the Third Circuit's direction that, generally, probable cause questions should be decided by the jury, the first issue is clearly not an inappropriate subject for laypersons to address. And while the causation question did rely to some degree on medical expert testimony, it was not testimony beyond the jurors' understanding. A juror need not have gone to medical school to infer a causal link between Rose's arrest and his heart attack, or to disbelieve arguments that, if Rose had never been arrested, he would have had a heart attack at the exact same time that he actually did or that the heart attack's occurring during a police stop was a mere coincidence. On issues such as this, the jurors' own experiences with nervousness or a racing heart on being pulled over by the police are likely, and justifiably, just as influential as medical testimony. The twin propositions that an arrest is a highly stressful situation and that heart attacks may be induced by stress are both well-known and easily comprehended by the average layperson.

Therefore, the Court cannot overturn the jury's verdict or order a new trial as to the issue of probable cause.

### iv. Qualified Immunity

Given the above, the Court also cannot find that the officers were entitled to qualified immunity. In deciding whether to grant qualified immunity, the Court must consider two questions: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This latter requirement means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202, 121 S. Ct. at 2156 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)). If the answer to both questions is "yes," then there can be no qualified immunity.

Here, both questions are clearly answered in the affirmative. The case law is well-settled that arrests can only be made with probable cause, a requirement which clearly stems from the Fourth and Fourteenth Amendments. Accordingly, a reasonable officer in Raisner and Burns's position would have realized that an arrest without probable cause was an arrest in violation of the Constitution. Therefore, because, as discussed above, there

20

was reason to believe that probable cause was objectively lacking in Rose's case, neither the officers nor the Township can take refuge behind the protections of qualified immunity.

### v. *Monell* Liability

Defendants also argue that there was insufficient evidence presented at trial to demonstrate a policy of unconstitutional activity that would be sufficient to trigger liability against Barrett Township under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). (*See* Doc. 149 at ¶ 23.) This argument took on increased significance after the jury assessed monetary liability solely against the Township. It is accordingly addressed at length in both the 50(a) and 50(b) Motions, but is addressed in this section only for the sake of convenience.

Under the landmark *Monell* decision, "a municipality cannot be held *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691, 98 S. Ct. at 2036. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S. Ct. at 2037-38.

> As [the Supreme Court's] § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must

demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997).

An unconstitutional policy need not be officially promulgated or even memorialized in writing to create liability under Section 1983. An unwritten custom can create liability if "the relevant practice is so widespread as to have the force of law." *Id.* A municipality can also be liable for inadequately training or supervising its employees if such failure has created a pattern of constitutional violations, *see Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000), or for inadequately screening its employees during the employee hiring process, *see Bryan Cnty.*, 520 U.S. at 413 n.1, 117 S. Ct. at 1392.

However, because, under *Monell*, a municipality cannot be liable via *respondeat superior*, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury," but rather relies on one of these alternative standards that some policy, custom, or failure on the part of the municipality caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405, 117 S. Ct. at 1389. Any such failure to train, screen, or supervise "must amount to 'deliberate indifference to the rights of persons with whom the [relevant employees] come into contact'" in order to "'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Connick v. Thompson*, \_\_\_

22

U.S. ___, 131 S. Ct. 1350, 1359-60, 179 L. Ed. 2d 417 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 1204-05, 103 L. Ed. 2d 412 (1989)).

In the present case, the jury found that Plaintiff proved by a preponderance of the evidence that Barrett Township "[f]ollowed an official custom approving of Officers Raisner and/or Burns's conduct" and inadequately trained and supervised Officers Raisner and/or Burns. (*See* Doc. 160 at 2.) On the other hand, the jury also found that the Plaintiff failed to prove that the Township inadequately screened either officer during the hiring process. (*See id.*)

Now, Defendants attack this determination, alleging that the record lacked sufficient evidence to support it. (Doc. 172 at 5.) Thus, Defendants argue that "it is clear that the only reason that the Township was held liable is because it was the employer of the Officers at the time, which is insufficient to impose Section 1983 liability against it." (*Id.* at 8.) According to Defendants, the traffic stop that resulted in Edward Rose's death was just an "isolated incident" which had not been causally linked to any pattern of similar violations or deliberate indifference by the Township Police Department. (*See id.* at 8-9.)

The Court, however, disagrees with these arguments and finds ample evidence in the record to support the jury's determination.

First, the jury heard approximately one hour of testimony from Attorney Justin McShane, an expert in the administration of field sobriety testing, whose expert

23

qualifications Defendants never challenged.[4]   (*See generally* Doc. 175 at 45:11-85:25.)

During this hour of testimony, Defendants never objected to anything that McShane said,

nor did they even exercise the opportunity to cross-examine him. (*See id.* at 85:18-25.)  As

such, McShane's extensive testimony was offered to the jury without challenge.  This

testimony explained in great detail the NHTSA standards to properly conduct a field sobriety

test, which, for the reasons discussed below, the jury could have found that the Township

followed only carelessly, if at all.

The jury was not, of course, obligated to believe that the NHTSA standards

discussed by McShane had any binding force on Barrett Township.  However, even if the

jury discounted McShane's testimony, Barrett Township Police Chief Steven Williams later

affirmed that the standards McShane described were in fact "the universal standard." (Doc.

176 at 20:4-13.)  Despite admitting that these standards are "universal" and that they apply

to the states by federal regulation, Williams stated that he himself had not been certified in

accordance with them. (*Id.* at 20:7-17.)  Indeed, Williams admitted to never having taken a

single class in any kind of field sobriety testing; instead, he testified that the entirety of his

training came from "on the job training from previous officers that were employed there.

Basically, experience." (*Id.* at 20:20-21:10.)  And even though he had not been certified,

Williams nonetheless admitted to regularly performing field sobriety tests "when I work

---

[4] As discussed in section VI.c.i-ii., *supra*, Defendants challenge other aspects of McShane's testimony.  But they do not argue that he was unqualified to speak to the NHTSA standards for field sobriety testing.

24

patrol." (*Id.* at 20:18-19.) He stated this even though he admitted later that "it would

benefit" to take a course in pre-arrest screening before arresting people for driving under the

influence. (*Id.* at 24:15-18.)

Likewise, Williams stated that Officer Raisner never went through training in the

aforementioned NHTSA standards either, but that Raisner had taken other, less formal

classes with the Pennsylvania State Police. (*Id.* at 36:3-37:7.) Raisner later confirmed that

at the time of the arrest he was not formally trained in standardized field sobriety testing or

on administering a roadside breath test for alcohol, and relied primarily on "on-the-job

training" as well.[5] (*Id.* at 71:14-72:3.) Perhaps evidencing for the jury a further laxity in

procedure, Raisner also testified that, even though Burns was in fact trained in field sobriety

testing at the time of the arrest, he nonetheless did not feel obligated to defer to Burns's

determination that Rose should not be arrested. (*Id.* at 72:22-73:7.)

The jury also heard testimony from Chief Williams that an official psychiatric

evaluation of Officer Raisner described him as "somewhat intolerant and insensitive to other

people" and added that "other people may find him rather crude, course [*sic*] or narrow-

minded." (*Id.* at 28:5-17.) Williams stated that this evaluation did not "send up any red

flags," but that it "would be an indicator to, possibly, keep an eye on him for that type of

behavior out in the field." (*Id.* at 28:23-25.) In the same vein, Williams had himself added a

note to Raisner's personnel file stating that Raisner had "[p]ossible problems with dealing

---

[5] Raisner did however testify that he later received more formal training in standardized field
sobriety testing. (*See* Doc. 177 at 20:21-21:12.)

with friends and locals." (*Id.* at 29:1-8.) He elaborated at trial that this note only indicated a general concern over the ability of police officers to act impartially in a community where they have friends among the local citizens. (*Id.* at 29:12-19.) However, Williams did not explain why, if he merely wanted to convey a general worry about favoritism, he focused only on Raisner as potentially problematic.

Williams also testified to keeping on file a cease-and-desist letter addressed to Raisner from a law firm identified at trial as "Orloski & Hinga," which accused Raisner of using his office "to harass private citizens" by intruding onto one Donald Burns's property and "driving by [Donald Burns's] home in [Raisner's] personnel vehicle." (*Id.* at 29:20-30:17.) The law firm purported to represent Donald Burns "covering [Raisner's] two visits to his property." (*Id.* at 29:23-30:1.) All that Williams did in response to this letter was "[c]all[] Officer Raisner into my office and [have] a discussion about the letter." (*Id.* at 30:18-21.) No record of this meeting was ever kept on file, (*id.* at 30:22-24), which led to the following exchange:

> CHIEF WILLIAMS: No matter what complaint it would be, that would be the first process, to call him in.
>
> ATTORNEY SALVATORE VITO [attorney for the Plaintiff]:   Right.   And thereafter, there's no memo to your file that you had the meeting?
>
> CHIEF WILLIAMS: No, only if there would be a disciplinary action.
>
> MR. VITO: Okay, so you didn't think that an allegation that he was violating people's constitutional rights was noteworthy?

26

CHIEF WILLIAMS: In hindsight, I probably should have. . . . In hindsight, it would have been a good idea to, at least mention that . . . . The note could have, at least mentioned in there that I did have a meeting with him, when the date and time was, and what his response to it was.

(*Id.* at 31:1-22.)

On another occasion, Williams testified to giving Raisner a written reprimand (but no other punishment) for missing five traffic hearings, which the written reprimand described as "unjust" and "unacceptable." (*See id.* at 32:3-34:11.)

Further, an admittedly anonymous letter[6] that Williams testified to receiving stated that Raisner exited his patrol car in front of a local supermarket "with his chest out," took out a police-issued AR-15 assault rifle, "stood there with it and then put it in the trunk of the car." (*Id.* at 34:12-35:9.) This caused one bystander to say, "He's not playing with a full deck" and then laugh. (*Id.* at 35:9-11.) Williams testified that this letter was "[d]efinitely something to talk to him about, absolutely." (*Id.* at 35:17-22.) The record does not reflect whether he did in fact talk with Raisner about it or whether he took any further action.

Finally, Eric Rose, Edward's brother, testified to a conversation with Chief Williams, to which testimony Defendants never objected. Eric stated that after his brother's death, he spoke to Williams and asked: "How could this happen? How could somebody in the custody of, like, the police . . . how can this happen on your watch[?]" (*Id.* at 165:13-15.) Williams allegedly responded by stating, "'Well, Larry is one of my more aggressive

---

[6] The letter was admitted without objection as to its reliability or authenticity, or as to its potential inclusion of hearsay statements.

officers.'" (Id. at 165:16-17.) Eric testified that he "took this a certain way," meaning that Williams's statement was indicative of the negative trait of having a hostile or combative demeanor. (Id. at 165:17-166:9.)

As to Officer Burns, Chief Williams testified to issuing a letter reprimanding him for missing four traffic hearings. (Id. at 37:10-18.) More significantly, the same letter also reprimanded Burns for failing to transport a defendant who Burns had arrested and temporarily placed in detention at the Monroe County Correctional Facility to the preliminary hearing in his criminal case. (See id. at 38:18-39:1.) On the latter issue, the letter stated, "Your failure to attend and bring the Defendant to his required preliminary hearing violated his due process rights, exposing our agency to liability issues." (Id. at 39:10-14.) It added, "Your actions and forgetfulness or laziness have violated an individual's due process rights and purported our police agency to be unprofessional and not committed to the public." (Id. at 40:8-13). Williams further testified that the only punishment for Burns's conduct was to be suspended for two days. (Id. at 41:11-13.) This testimony, however, was offered to the jury with the caveat that the defendant whose rights were admittedly violated did not ultimately miss his hearing but was only late, (id. at 39:6-9), and that the incident occurred a few months after Rose's death, (id. at 40:1-7). However, Williams stood by his statements that Burns's actions violated an individual's due process rights. (See id. at 42:12-15). Such evidence, when viewed in light of all the rest, could reasonably lead the jury to conclude that

a pattern of unconstitutional activity existed, even if this one incident happened after Rose's death.

Williams concluded his testimony by stating that, having watched the video of Rose's death, he would not have done anything different from what the Defendant Officers themselves did. (*Id.* at 44:9-14.) Likewise, during their own examinations, Raisner and Burns agreed, and said that they would do everything the same way. (*Id.* at 79:6-9 (Raisner); Doc. 177 at 108:2-7 (Burns).) If the jury found the stop to be lacking in probable cause, then it might also reasonably have found this commitment to act the same way all over again to be further evidence that the Township adheres to a custom of unconstitutional activity.

Of course, this is not to say that the jury must have found the existence of *Monell* liability and that any other finding would be unreasonable. Defendants presented rebuttal evidence on most of the points discussed above. This evidence, however, did not tend to definitively disprove the testimony, but only cast it in a somewhat different light. Accordingly, it was up to the jury to decide which side it believed: a task that relies not only on the evidence presented but also on such intangibles as the officers' demeanor in court. The jury could reasonably disbelieve the officers' explanations and could reasonably find that some or all of the evidence listed above showed a pattern of unconstitutional activity that caused the officers to violate Edward Rose's rights and, ultimately, to cause his death. The Court cannot say that such a determination was unreasonable or wrong as a matter of

law. Therefore the relief sought by the Defendants must be denied and the jury's assignment of *Monell* liability must stand.

### c. Post-Trial Motion (Doc. 166)

In their post-trial Renewed 50(b) Motion and Motion for a New Trial, Defendants raise the above issues by reference, and devote a good deal of space to the issue of *Monell* liability. (*See* Doc. 166 at ¶¶ 1-7.) All of these bases for relief are denied for the reasons already discussed. It is to the remaining issues raised in the Post-Trial Motion that the Court now turns.

### i. "Denial" of Defendants' Second Motion in Limine

First, Defendants' argue that "[t]he Court erred when it denied Defendants' Second Motion in Limine and permitted evidence that DUI field tests cannot be administered by police officers to individuals older than 65 years of age and the NHTSA manual and regulations." (*Id.* at ¶ 8.) This argument, however, relies on a mischaracterization of the record and, as such, is not a proper basis for relief.

Defendants' Second Motion in Limine requested that the Court exclude expected trial testimony "that DUI field tests cannot be administered by police officers to individuals older than 65 years of age." (*See* Defs.' Second Mot. in Limine, Doc. 101, at ¶¶ 12, 18.) In the course of motions practice, Plaintiff clarified its intentions as to such testimony, stating that

> Plaintiff seeks to present evidence as to the proper standards for all field sobriety tests that were administered by the officers on the night in question, specifically, National Highway Traffic Safety Administration (NHTSA) standards adopted in Pennsylvania through the Institute for Law Enforcement

Education (ILEE), as discussed in Plaintiff's Second Motion in Limine requesting judicial notice or alternative relief. It is Plaintiff's position that all tests were administered improperly under the accepted standards, age and/or weight sometimes being a factor.

(Pl.'s Brief in Opp. to Defs.' Second Mot. in Limine, Doc. 114, at 2.)

During the Pretrial Conference, the parties and the Court discussed the applicability

of the NHTSA manual that promulgated these standards.  Salvatore Vito, attorney for the

Plaintiff, stated that he had submitted to the Defendants a copy of the NHTSA manual that

was in effect at the time of the arrest. (*See* Unofficial Tr., July 3, 2013, at 6:9-20.)  This led

to the following exchange:

MR. VITO:  [The copy submitted] should be identical to the NHTSA standards applicable in Pennsylvania.

ATTORNEY ROBERT HANNA [attorney for the Defendants]:  We are not fighting that, you can use that as cross examination of the witnesses . . . .

THE COURT:  [Mr. Vito has] asked me for judicial notice of the document. He's asked that I take judicial notice of that NHTSA document.  But [Mr. Vito has] gone, I think, a step further and said, in addition to that, take judicial notice this is the governing standard for field sobriety testing, etc.

MR. VITO:  And I believe it is.

THE COURT: Is that an issue, at this point?

MR. HANNA:  I don't think so.

THE COURT:  Okay.

MR. HANNA:  *This is the standard our guys have trained under.  They're certified under these standards.*

THE COURT:  So that motion might be something I can do something with.

31

MR. HANNA: *Sort of moot.*

(*Id.* at 6:22-7:16 (emphases added).) This discussion was in the context of Plaintiff's

Second Motion in Limine. However, as the record makes clear, Plaintiff's Second Motion

involves the same subject matter as Defendants' Second Motion. Thus, later, in addressing

Defendants' Motions, the Court began:

> THE COURT: Now, as far as the two motions [in limine] you filed, Mr. Hanna, they, as I said earlier, seem to raise the same issues as the first two motions that the Plaintiff raised.
>
> MR. HANNA: Yes, we criss-crossed.
>
> THE COURT: Again, barring some change of heart on my part . . . *the second issue on NHTSA, I think we have resolved.*
>
> MR. HANNA: *Correct.*

(*Id.* at 18:21-19:5 (emphases added).)

On the basis of this understanding, the Court issued an Order (Doc. 127), which

read, in pertinent part:

> 2. The Court will **NOT RULE** on Plaintiffs' and Defendants' Second Motions in Limine (Docs. 101 and 105) as the parties have agreed that such motions are **MOOT**.

(Doc. 127 at 7.)

Thus, it is clear that the Court did not "deny" Defendants' Second Motion in Limine,

as Defendants now claim.

Moreover, to the extent that Defendants now seek to exclude the entirety of the

NHTSA standards, such an argument was also waived during the Pretrial Conference, at

which time the following exchange occurred:

> MR. VITO: Well, I advised you that we were using the NHTSA standard two
> weeks ago and you objected to it.
>
> MR. HANNA: We objected to it because it wasn't a document that you had
> disclosed, and it wasn't a document we had disclosed, so we didn't have the
> standards. At that time, we only had the certificates saying they had been
> trained under those standards. So I didn't know what to do except object to it.
> Now that we have them, everybody's got the standards, *you're
> welcome to use them in cross-examination. I don't have any problem with
> that.*
>
> THE COURT: All right.
>
> MR. HANNA: That makes that moot.

(Unofficial Tr., July 3, 2013, at 13:13-24 (emphasis added).)

As these discussions make clear, the Defendants' attorney himself admitted that the

very issue on which Defendants now seek relief was moot, and that the Plaintiff was

"welcome" to engage in the conduct of which Defendants now complain. Defendants may

not obtain post-trial relief because the Court followed their invitation to not rule on a moot

motion or because Plaintiff followed their invitation to introduce certain evidence at trial.

Finally, even if the Defendants' arguments on this matter were to be credited,

Defendants never objected to the NHTSA manual at trial. Indeed, in his opening statements

to the jury, Mr. Hanna stated with regard to NHTSA that, "We don't really dispute that

they're the national standards." (Doc. 175 at 34:13-14.) Nor did Defendants object to any

part of Justin McShane's testimony explaining the NHTSA standards, including the

standards on administering field sobriety tests to individuals over 65 years old.  While

Defendants disputed the applicability of various NHTSA provisions, they never challenged

the admissibility of the relevant testimony after the Court declined to rule, for reasons of

mootness, on their Second Motion in Limine. (*See* Doc. 127 at 7.)  Thus, whatever merit

Defendants' argument might have had was waived through Defendants' own inaction.

Defendants' attempt to excuse such inaction by reference to the case of *American*

*Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321 (3d Cir. 1985) is

likewise unpersuasive.  In that case, the Third Circuit stated that the relevant "question

before this court is whether a *denial* of a motion in limine is sufficient to preserve for

purposes of appeal the specific issue raised in the motion" or whether counsel would need

to object again on the same issue during trial. *Am. Home*, 753 F.2d at 324 (emphasis

added).  In the *American Home* case "[t]he trial court held a hearing at which it considered

the arguments of counsel and made a definitive oral ruling with no suggestion that it would

reconsider the matter at trial." *Id.* at 324-25.  The Circuit concluded that, "[u]nder these

circumstances, requiring an objection when the evidence was introduced at trial would have

been in the nature of a formal exception and, thus, unnecessary." *Id.* at 325.

In the present case, by contrast, the Court did not make any ruling on Defendants'

motion and, as discussed below, informed the parties that it would favorably entertain

objections to NHTSA testimony at trial. (*See* pp. 40-41, *infra.*)  The fact that such

34

procedural history bears no applicability to that of *American Home* is self-evident and should not require further explanation.

### ii. Alleged Violations of Rules 26(a) and 26(e)

Defendants' last basis for relief is that "Plaintiffs violated [Federal Rules of Civil Procedure] 26(a) and 26(e) in failing to identify the NHTSA manual violation and witness Justin McShane, Esquire, until they were first mentioned in Plaintiffs' Pre-Trial Memorandum." (Doc. 166 at ¶ 9.) They add that "Defendants were severely prejudiced by this late notice as they were not permitted to conduct any discovery on the NHTSA standards and/or depose Attorney McShane, who ultimately testified at trial." (*Id.* at ¶ 10.) Because of this alleged late disclosure, Defendants argue that the Court should have excluded both McShane's testimony and the NHTSA manual. (*Id.* at ¶¶ 11-12.)

As to the NHTSA manual, the conversations from the Pretrial Conference cited above show that Defendants expressly waived their disclosure-based objections to the manual and even invited Plaintiffs to introduce it at trial. Moreover, it is difficult to see how Defendants "were not permitted to conduct any discovery on the NHTSA standards" given that Mr. Hanna stated during the Pretrial Conference, a full 19 days before trial, that he had the manual in his possession. (Unofficial Tr., July 3, 2013, at 13:20.)

As to Justin McShane, the Court held a conference call to discuss the matter of his alleged late disclosure on July 19. At that time, Defendants argued that McShane should not be allowed to testify because he—an expert witness—was not identified in the initial

35

expert reports, but only in Plaintiff's Pretrial Memorandum. (*See* Official Tr., July 19, 2013,

Doc. 174 at 2:9-3:5; *see also* Letter from Robert Hanna, July 18, 2013, Doc. 144, at 1.)

Federal Rule of Civil Procedure 26 requires in relevant part that "a party must

disclose to the other parties the identity of any witness it may use at trial to present

evidence under Federal Rule of Evidence 702, 703, and 705." Fed. R. Civ. P. 26(a)(2)(A).

"[T]his disclosure must be accompanied by a written report—prepared and signed by the

witness—*if the witness is one retained or specially employed to provide expert testimony in*

*the case* or one whose duties as the party's employee regularly involve giving expert

testimony." *Id.* at 26(a)(2)(B) (emphasis added). The Rule continues that

> [u]nless otherwise stipulated or ordered by the court, if the witness is not
> required to provide a written report [under Rule 26(a)(2)(B), *supra*], this
> disclosure must state:
> > (i) the subject matter on which the witness is expected to present
> > evidence under Federal Rule of Evidence 702, 703, or 705; and
> > (ii) a summary of the facts and opinions to which the witness is
> > expected to testify.

*Id.* at 26(a)(2)(C). Rule 26(e) requires a party who has made a 26(a) disclosure to

supplement or correct its disclosure "if the party learns that in some material respect the

disclosure . . . is incomplete." *Id.* at 26(e)(1)(A).

Here, however, Plaintiff's Pretrial Memorandum provided all the information required

under Rule 26(a). First, the Memorandum lists the unretained experts who may be called at

trial in the following complete and verbatim form:

> Unretained expert witnesses (if necessary, with leave of Court):
> > Thomas Sundmaker, Esquire and/or Justin McShane, Esquire

36

Training and certification in standardized field sobriety testing

(Pl.'s Pretrial Mem., Doc. 111, at 3.)

The disclosure clearly states that McShane is a non-retained expert, an assertion

that Defendants never challenged.[7] Thus, on the face of this matter, it appears that

McShane was not required to submit an expert report under Rule 26(a)(2)(B) (which applies

to witnesses "retained or specially employed to provide expert testimony"), but rather was

subject to the disclosure obligations in 26(a)(2)(C).

Nor have Defendants persuasively argued otherwise. During the conference call,

the Court addressed Attorney Hanna as follows:

> THE COURT: I'll be interested in hearing what else you have to say, but let
> me just say to you at the outset that having looked at the case law, it does not
> appear that an unretained expert must provide an expert report in these
> circumstances. Now, if you want to present me with contrary authority, I'll be
> happy to look at it, but thus far, our research here has disclosed no such
> contrary authority.

---

[7] While an objection could have been raised as to McShane's genuine status as a non-retained
expert, Defendants instead based their objections on the argument that McShane was required to provide a
written expert report in the same manner as experts retained or specially employed under Federal Rule of
Civil Procedure 26(a)(2)(B). (See, e.g., Doc. 166 at ¶¶ 9, 11; Doc. 172 at 10-11.) But since McShane's
status as a non-retained expert is not in dispute, then Defendants' arguments do not apply to him, because
different disclosure obligations apply to retained and non-retained experts.

   Moreover, even if Defendants had challenged McShane's status as a non-retained expert,
McShane's testimony was expressly limited by the Court to an explanation of the field sobriety procedures
set forth in the NHTSA manual, (see p. 40, infra), a manual whose admissibility was not challenged by the
Defendants and whose application as the governing standard in Pennsylvania was admitted by Barrett
Township's own representative, Chief Williams, (see p. 24, supra).

   Accordingly, McShane did not offer any expert opinion testimony on the issues that were in dispute
at trial. And even if McShane had gone beyond the scope of permissible testimony to offer expert opinions
(a claim which Defendants have not asserted), the Defendants never objected to any such testimony at
trial, even though they were informed by the Court during the July 19 conference that any such objections
would be favorably entertained, (see pp. 40-41, infra).

(Doc. 174 at 2:13-19.) Mr. Hanna, in response, cited no contrary authority and relied

instead on generalities that conflate the different requirements for retained and non-retained

experts:

> MR. HANNA:   Well, if you're going to supply a liability expert [*sic*: as
> discussed below, McShane was limited to testifying only about the content of
> the NHTSA manual], I think you have to disclose that information, in
> accordance with the discovery scheduling order.  Now, the scheduling order
> for identifying experts expired 16 months ago.  So to have an expert named
> for the first time in the pre-trial memorandum, that's not a good thing.  That
> puts us in a situation in which we really have a problem trying to respond to it.
> And I think that, you know, there's a due process thing here, and the
> scheduling order and the rules are pretty clear that you have to disclose your
> experts, and it wasn't done.
>
> THE COURT:   Well, Mr. McShane is mentioned, both in the pre-trial
> memorandum, as well as in Mr. Vito's response—or his response in
> opposition to your second Motion in Limine.  And, again, not to belabor the
> point, but it looks like under Federal Rule 26(a)(2)(B), not only under that rule
> on its face, but under the commentary that follows, as well as the case law
> that's interpreted that section, that if he's a non-retained expert, there isn't a
> need for an expert report.
> So, on that basis, I'm afraid that your objection, in my mind, is without
> merit and I will be overruling it . . . .

(*Id.* at 2:20-3:14.) Since the Court made this ruling, Defendants have still provided no

contrary authority to show that McShane was required to submit an expert report.  Instead,

they merely repeat talismanically that "Plaintiffs violated Rule 26(a) and 26(e) in failing to

identify . . . witness Justin McShane, Esquire, until [he] was mentioned in Plaintiffs' Pretrial

Memorandum," (Doc. 172 at 10), but give no affirmative reasons for the Court to reconsider

38

its previous ruling. As such, the Court must conclude that Defendants' objections are as meritless as they were when the Court first made its ruling.

Moreover, the information contained in the Pretrial Memorandum, while admittedly minimal, appears to satisfy the 26(a)(2)(C) requirements, and thus constitutes appropriate disclosure under the Federal Rules. In listing "training and certification in field sobriety testing," under McShane's name, (see Doc. 111 at 3), the Pretrial Memorandum specifies "the subject matter on which the witness is expected to present evidence," and therefore satisfies the Rule 26(a)(2)(C)(i).

After providing the disclosure quoted on pages 36-37, supra, the Pretrial Memorandum continues: "Mr. Sundmaker and/or Mr. McShane would testify, if necessary, with leave of Court, regarding the application of National Highway Traffic Safety Standards for pre-arrest screening for DUI in Pennsylvania as universally accepted." (Id.) This paragraph sets forth the facts and opinions on which the nonretained experts were expected to testify, and thus satisfies the requirements under Rule 26(a)(2)(C)(ii) as well.

During the conference call on this matter, the Court elaborated:

THE COURT:   Mr. Vito, in your documents, particularly, in your brief in opposition, and I think as well in your pre-trial memorandum, as well, you limited what Mr. McShane would testify to.

MR. VITO:  Correct.

THE COURT:   And you made it clear that he would be called simply to testify as to the [NHTSA] standards and what they meant.

MR. VITO:  That is correct.

39

(Doc. 174 at 3:16-23.)  Later on in the call, the Court stated:

> THE COURT:  Now, I think we have already—and correct me if either one of
> you think that I'm wrong, I think we have established that the NHTSA
> standards do apply, that they do govern the field sobriety testing procedures,
> and I don't have any problem with Mr. Traenkle, on behalf of the Defendant,
> or Mr. McShane, on behalf of the Plaintiff, coming in and on the basis of the
> manual testifying to what the field sobriety tests testing procedures are.
>     But just as I said with Mr. Traenkle, I'm not going to allow Attorney
> Justin McShane to give an opinion as to whether or not these officers, in this
> particular case, correctly applied the standards or whether or not they had or
> didn't have probable cause or reasonable suspicion.  Because, again, they
> are legal opinions, which I am not going to allow.  That's my province and not
> theirs.

(*Id.* at 4:25-5:14.)  And further:

> THE COURT:  I'm seeing Mr. McShane, as a non-retained expert, not having
> to have provided an expert report.  I'm anticipating his testimony, but I'm
> limiting it, just as I limited Mr. Traenkle's testimony to a discussion of the
> NHTSA standards and a discussion of police procedures, without offering any
> legal opinions as to what was right or wrong, what was or was not a proper
> arrest, what was or was not a proper stop.
>     I mean, I think I'm making myself clear, and if I'm not, you need to tell
> me right now.

> MR. HANNA:  I think you're making yourself very clear.

(*Id.* at 6:20-7:4.)

The Court also made clear that it would favorably entertain objections to testimony

that ventured outside the strict bounds imposed:

> THE COURT:  I hope I'm wrong, but I anticipate each of you objecting on the
> grounds that other counsel is going beyond what's permissible, in light of my
> prior rulings, and I'll deal with it.

> I mean, fellas, you know what I'm saying is allowable.  If you cross
> what I think the line is that I've laid out, then, I'm going to sustain an objection.
> I don't know what else I can tell you at this point.

(*Id.* at 7:24-8:6.)

In sum, these instructions, which Defendants' counsel called "very clear," expressly

stated that McShane and certain defense witnesses would be allowed to testify as to what

the NHTSA manual—a manual that both parties agreed to be admissible during the Pretrial

Conference—actually says, but that no testimony beyond these narrow parameters would

be permitted, and that objections to testimony that exceeded the scope of what the Court

had identified as permissible would be sustained.  Defendants chose to neither object to any

of McShane's testimony nor to cross-examine him at any point during the trial.  Such is, of

course, their prerogative, but, having waived every opportunity to challenge McShane at

trial, Defendants cannot now claim unfair prejudice.

### iii.  In the Alternative, Any Error Was Harmless

Finally, even if all of the Court's rulings on the NHTSA manual and Justin McShane

were in error, the relief that Defendants seek would still be inappropriate.  As discussed at

length above, there was sufficient evidence to sustain the jury verdict even in the absence

of the manual or McShane.  Such evidence includes, but is not necessarily limited to: the

video of the stop and arrest, which could reasonably be interpreted as showing an arrest

lacking in probable cause; the potentially incriminating statements made by the officers

caught on video camera; the testimony of Chief Williams, which the jury could reasonably

find to evince a pattern of deliberate indifference to the constitutional rights of people like

Edward Rose; and the testimony by all officers of Raisner and Burns's minimal training in

the administration of field sobriety tests. Indeed, it is quite probable that this evidence—

based as it was on the real and palpable human drama that culminated in the stop, arrest,

and death of Edward Rose—was more persuasive to the jury than the recitation of National

Highway Traffic Safety Administration protocol.

## V.        Conclusion

For the reasons stated above, Defendants' Motion for Judgment as a Matter of Law

or, in the Alternative, for a New Trial (Doc. 166) is **DENIED**. A separate Order follows.


Robert D. Mariani
United States District Judge

42